Please rise. This court is now in session. You may be seated. Mr. Clark, please call the next step, please. 3-15-0-8-1-6 Lake Holiday Property Owners Association Appellant by Richard Gallo v. Illinois Commerce Comm'n of Appalachia by Thomas Bacon, Wisconsin and Utility Services of Illinois, Appalachia by W. Michael Seidel. Mr. Gallo. Richard, if I can welcome Your Honor. Good morning, Your Honor. This is Richard Gallo on behalf of the Lake Holiday Property Owners Association, which is a 1,500-acre community near Sandwich, Illinois. If you're not familiar with it, they receive water services... I was so familiar with it, I remember when they were building Lake Holiday. Then you're one up on me. Because I lived in Sandwich, Illinois. Oh, okay. That's the extent of my knowledge of Sandwich, Illinois. Anyway, they received their water service from Lake Holiday Utilities, which was owned by Utilities, Inc. Utilities, Inc., in 2014, was merged and changed into Utilities Service of Illinois, and I'll refer to it as USI. USI has 22 water-operating utilities in the state of Illinois. The one thing I want to talk about, how they set rates. Prior to the merger of the utilities into USI, what happened was each water utility had a separate rate set by the Public Utility Commission. This is so because water utilities, unlike electric utilities or gas utilities, are very specific to the location and services that are provided. They are not interconnected like other utilities. For example, in Lake Holiday, if there is a well pumping up water and putting it into the system in Lake Holiday, that water does not and cannot physically be transported to another USI company somewhere else in the state. So that's why the rates were set on a separate basis. Now, as part of the 2014 consolidation, the Commission looked at it and said, all right, you can combine these utilities and make them into one system, but they had a couple of conditions. First of all, they said as part of that consolidation, what will happen is the rules and regulations concerning these 22 systems has to be consolidated into one. However, the rates as part of the consolidation were still set separately, and the consolidation did not change that. And as part of the consolidation case, the Commission made a very important finding. They said that the proposed merger is not likely to result in any adverse rate impact on retail customers. So you can go ahead and merge. You can combine these into one, but there cannot be any adverse rate impact. Well, what happened? Utilities Service Illinois filed for a rate increase. And as part of that rate increase, it was for all 22 water utilities. Now, just so I'm clear, there are also nine wastewater utilities within that system, but that is not part of this appeal. So the 22 water systems then were going to be charged one system-wide rate for the entire state. What was the impact of that? Well, the impact of that on my client was that they were going to see their rates increase by 110%. The statewide request that the company had made was for a 36% increase. The Illinois Commerce Commission conducted a study as part of the rate case and found that if the Commission had continued to set rates based upon the individual system, not the combined systems, Lake Holiday's rates would go up about 40%. So what we're seeing is that there is an adverse impact on the residents of Lake Holiday. And that is a direct result of the merger and the fact that the Commission, as part of this proceeding, did two things. First of all, they abandoned the traditional and long-set practice of setting rates for these 22 water utilities from being based on an individual basis to putting them on a system-statewide basis. Second, they ignored and abandoned the language that they had passed in 2014 that said this consolidation is not going to result in an adverse impact on rates. Well, I submit that a 110% increase in rates is an adverse impact, especially when the Commission itself said that had we continued our practice of setting these rates on an individual system-wide basis, the increase to Lake Holiday would only be 40%. So we have, I believe, a violation of the state law in that rates are to be fair and reasonable and also that you should not charge customers for service that is not provided to them. And when the Commission departs from its standard practices, any decision is entitled to less deference upon review. As I mentioned briefly, there is a huge difference between the water utilities, which have individual systems, and electric and gas utilities, which have, for the most part, statewide rates. And that's because the facilities are different. And I think that is shown in the case of the City of Chicago, which we cited. And I want to go through that for just a moment because I think that's helpful. In the City of Chicago case, what you had was Commonwealth Edison charges a rate or their system-wide rate. Then they also, they then set aside for the City of Chicago and said, we're going to carve out those localized costs for you for the franchise fee that is being charged because you're located in the City of Chicago. The City of Chicago appealed saying, no, that should be system-wide rates and it should be spread among all of the customers. What the court said was, no, where you have localized costs, those costs should be charged to the customers who are causing those costs to be incurred. How does that apply? That's exactly what we propose should be done in this case. The localized costs for Lake Holiday should be charged to Lake Holiday. Lake Holiday should not be paying for facilities that are furnished to Char Moore or other utility systems located and operated by USI. And the City of Chicago case further said, where you have costs that are incurred by everyone, yes, you should pass those on. For example, transmission facilities or generating facilities, that's appropriate for statewide rates. So what happens now in this case is we're essentially having Lake Holiday incur and pay a subsidy for other utilities that are having a subsidy from Lake Holiday because we are paying more than we should pay. And USI actually admitted that during the testimony because their witness said that the reason they wanted the statewide rates is because a lot of the water systems, as you can imagine, are in small communities and have few customers. Some of them only have like 300 customers. Well, any time you make an improvement, a system improvement for that particular system, those costs are going to impact those customers. And what USI said was, well, the way to solve that is we'll have the bigger utility, the bigger systems, such as Lake Holiday, pay more because then that reduces the cost of the other systems. In fact, their witness, Steve Ubertuzzi, said, if a small standalone utility requires a significant capital improvement, these costs can be spread over a large base of consumers. That is not cost causation. That is not having customers pay the reasonable charges that they should pay for receiving service. They are paying for service that they will, for facilities that they will never use, that they physically cannot use. Now, the other thing that USI and the staff and the commission argued in their brief is that, yes, there are consolidated systems in the state who have statewide rates. And USI went so far as to say and refer to Illinois American Water Company, saying, well, here's an example. Illinois American Water Company has statewide rates, and they're a water company, so it's appropriate for USI to have statewide rates as well. However, the very case that USI cites shows that there are significant differences. First of all, Illinois American does not have statewide rates. Illinois American has four separate districts where rates are set on a district level. And within those districts, the rates are further set by whether or not the facilities use pump water or whether they purchase water. So the very case that USI argues that you should have statewide rates and have this cross-subsidy going on does not support that position. The cases indicate that as rate payers that we're entitled to and the company is entitled to demand no more than that which is to be exacted from the services that are rendered and what the facilities are worth. We submit that as a result of the fact that we are paying 110% rate increase when the facts show and the record is undisputed that on a stand-alone basis, that increase would have only been 40% that we are being charged unjust and unreasonable rates. And that because the commission ignored its own past practice of setting rates, first of all, on a system basis rather than statewide, and second, they ignored their own ruling in the consolidation case that said there will be no adverse rate impact on customers, that the final order in this docket violates the Public Utilities Act and therefore this court should reverse the decision. Any questions? Thank you. May it please the Court. Tom Stanton on behalf of the Illinois Commerce Commission, Special Assistant Attorney General. The penalties have split the 15 minutes evenly and we've divided the argument in two ways. I'd like to first address the standard group review and the association's arbitrary departure from past practice argument and then Mr. Seidel on behalf of USI will address the association's arguments that the order impermissibly imposes costs on rate payers of utilities or facilities that they don't use and also the argument that the commission ignored the rate impact of the consolidated rate structure on USI's facilities. So this case involves the commission's rate making order consolidating USI's 22 water divisions into one water group and also approving a single consolidated rate structure for all of USI's residential customers throughout Illinois. The order is the culmination of a logical transition from 23 individual public utilities with various rate structures to one public utility with a uniform rate structure and that company provides the water service to all customers in the former territories of the 23 public utilities. So under this rate consolidated rate structure of the 22 USI territories the evidence showed that the average customer in five of the territories would receive rate decreases. The average customer in ten of the territories would receive rate increases under the single rate or consolidated rate but less than they otherwise would have received on a stand-alone basis. And then finally the average customer in seven of the territories would receive rate increases under the single rate structure greater than they would have received under a stand-alone basis like kind of a previous analysis when there were 23 separate public utilities but again there are no longer 23 public utilities. They ceased to exist. All the licenses, permits have been transferred to USI so there's one public utility. Now rate design is complex and it involves making judgment calls and here the commission weighed all the evidence and considered the interests of all USI customers not just like holidays but all of the customers and again some are getting decreases, some are getting rate increases less than they would have under the old system. So no one likes rate increases but a single rate structure, it's fair, it's efficient, it's understandable and it's commonplace to other regulated utilities. So turning to the first issue, standard review. The association argues in the brief for a de novo review but that's clearly incorrect, right? The court's review of the commission's order is deferential and the standard review is abuse of discretion. That's because a just and reasonable rate, it's a question of fact committed to the commission's sound judgment. It's not the product of the legal formula and so therefore this court is not asked to interpret the Public Utilities Act. We all know that the Public Utilities Act says that rates must be just and reasonable. Once again, a just and reasonable rate is a question of fact. So under this standard review and abuse of discretion, the commission's decision is well-reasoned, supported by ample record evidence. For example, there's testimony from U.S. eyewitness Lubertazzi regarding the benefits that are associated with consolidated rate structure. One of the important issues for the commission back in 2012, the commission told the 23 utilities when they existed to present a business plan to the commission to reduce the regulatory costs. When a company would come in, one of the smaller companies, or have several companies come in, say they came in for a $100,000 rate increase, the rate case expenses were a large percentage of the actual rate and those rate case expenses get recovered from the customers if they're reasonable. So you have, when you have all these individual public utilities, you have high rate cases. So one of the benefits of the consolidation and the merger of those 23 public utilities into one public utility is reduced regulatory costs. There's also the consolidated rate allows U.S. eye to spread to large capital improvements for any territory, not just smaller territory like Camelot or Delmar, but also for like Holloway too, allows them to spread these costs over a larger customer base to avoid a potential rate shock in any particular group. And then finally, U.S. eyewitness Lubertazzi testified that it would align U.S. eye's rates with the rate structure of other utilities like ComEd and Amarin and on the gas side too. So there's also testimony from staff witness Boggs. He analyzed the rate impact of U.S. eye's proposal. He analyzed the different rate structures. He looked at a number of the territories. He tried to take some out, see what the rate impact would be. And his conclusion was that you could take some of the territories out like Holloway, but you would raise the rates for the other customers, the customers in the other territories. So it was his recommendation based on his analysis that the benefits of the consolidation outweighed the disadvantages, and so he recommended that to the commission. So there's nothing to Lake Holloway's first argument that the commission arbitrarily departed from its past practice. The association ignores the change in circumstances that were occasioned by the merger. In 2014, Lake Holloway and the 22 other former utilities were merged into U.S. eye, so they're no longer public utilities. There's just one public utility, and that's U.S. eye. And in the ordinary course, the commission sets rates based on customer class, and it's one public utility, and you have uniform rates, and that's the nature of public utility rates. They're shared amongst their customer classes, and the customers in this 15,000 quarter customers are primarily about 90% residential, and so the commission set uniform rates for that residential class. They also have business commercial class. That's only 10%. The commission set rates for those two for that class. But the uniform consolidating structures are for residential and then for the business. So in this situation, it was a different situation. So that's why the commission is not departing from its past practice. In fact, the commission set the rates based on one utility like it does in the other context. In addition, the commission explained the basis for its decision. The commission summarized the evidence and gave reasons for its decision. They were all supported by the record evidence. The association doesn't disagree that the commission gave reasons for its decision. It just disagrees with the result, but that's not enough. With respect to their argument today about that the commission, by consolidating or by using a consolidated rate structure, violated the merger order, that's not the case. The commission made the finding that the merger would not likely have adverse rate impacts for the customers because at the time of the merger, the commission directed USI to retain those preexisting rates until the commission approved different rates. And that's what the commission did here. It approved different rates on a different record, so there wasn't a violation of the merger order itself. The merger itself was fine, and the commission directed, like I said, to retain those rates until the commission changed it. And when USI came in with their proposal to change it in this case, based on the record, based on the evidence, the commission made that decision in this case. Thank you. If there's no questions. Thank you, and good morning. My name is Mike Seidel. I filed the brief on behalf of the Appellee Utility Services of Illinois, Inc., and I want to thank Mr. Stanton for addressing that more esoteric subject of the standard review and the point that the consolidated rates did not constitute an unexplained dramatic departure from past regulatory practice. I will address Lake Halliday's claim that the Public Utility Act mandates or compels the commission to approve a rate design that assures Lake Halliday customers only pay for the cost of facilities used to provide service to them. I will also address Lake Halliday's contention that the commission failed to consider the adverse impact of the rates on Lake Halliday customers. Essentially, Lake Halliday contends that the consolidated rates are unlawful because they violate the requirement of 1-102D3 of the Public Utility Act, which provides that the cost of services shall be allocated to those who cause the cost to be incurred. However, the very next subsection expressly authorizes reliance on other factors so long as the rationale is set forth, and I think that the commission order very clearly sets forth the rationale for departing from 1-102D3. You know, your opponent provides a lot on that city of Chicago versus the Illinois Commerce Commission case from 1996. Correct, and my response to that is it's very clear in that opinion that the court and the commission found that the franchise fee, I quote, overwhelmingly benefited the customers that reside in the city of Chicago. Essentially, it was a tax which was used to provide police, fire, roads, and other governmental services to the residents of the city of Chicago, and the commission determined that since the benefits of that franchise fee were overwhelmingly provided to the city of Chicago, that was a justification for having that fee charged only to the residents of the city of Chicago. Our case is different because the commission found that there are benefits of having a uniform rate in that number one, it provides a larger customer base over which to spread the fixed costs or the cost of investments in large capital improvements over a larger customer base. And you consolidated there. I mean, there were consolidations in a large area. Correct. In fact, I would say that no service area is contiguous to another. They're spread out across northern Illinois, basically. And I think what Lake Holiday overlooks is that, and doesn't correctly characterize Mr. Lubertosi's testimony in that respect, is that Lake Holiday is a small utility by itself. And when it needs to have mains replaced or its plant is subject to substantial capital improvements for water quality purposes, those investments are going to be spread across 15,000 customers, not 1,800, and that's a substantial benefit to the customers of Lake Holiday as it would be to any small utility to maintain rate continuity and avoid rate shock that would occur if that entire investment descended upon their customers without the ability to spread it across a wider customer base. Isn't Lake Holiday arguing for kind of a flexible definition of costs? Right now they want costs to be defined as what makes them economic, what makes them frugal, what makes them save money for the customers. But in the event that there is a need for repair to that small system, then they're going to want that cost shared. Correct. So really, the Chicago case talks about unique additional charges that are unrelated to the production of power or the commodity that is subject to the utility. That's correct. It brings to mind the fact that really Lake Holiday is not currently paying only the costs incurred to provide service because there are a number of back office functions and services such as billing, shared vehicles, shared employee expenses that are shared among the utilities and which has reduced the costs of utility services for all the 23 utilities. It appears that now that we're taking this next step to make sure that all the costs are shared system-wide, they don't want to be a part of it anymore. Correct. And for that reason, I think they're short-sighted in overlooking the fact that they are going to receive a benefit in the future when there is a substantial capital investment required to maintain their services. I would note that... These are all considerations that the commission has to consider. Correct. Not just the present, but the way the future will play out. Correct. One minute, please. In our brief, we argue very strongly that the REACT case should control the outcome in this case. In that case, the court upheld the rate design that charged certain customers a share of the cost of facilities not utilized to provide them with services. REACT opposed the rate increases that ultimately approached 140% and 129% and claimed that their rates would be 36% less, their increase would be 36% less if the cost of the facilities not utilized to provide REACT with service were excluded from their rates. The court held the act does not mandate an exacting facility-to-customer class matchup. The court recognized that the commission could properly take into account other factors such as the affordability of rates, the preservation of the availability of utility services to all across the state, and the avoidance of unreasonable differences as to rates between localities. Our rates mean that the customer in Lake Holiday is paying the same as a customer in Camelot, which is in Juliet, for the same amount of water. There are some customers whose rates are being reduced as a result of this consolidation by over $1,000 annually. Those customers, the affordability of their rates was a matter of extreme concern to those customers, and it would be not possible to make utility services available to small, stand-alone utilities if we were not able to combine the total investment to serve the class of residential customers that we primarily serve. I'll wrap up there and make myself available for any further questions. Thank you. I want to address just a couple points. One, they talk about a change in circumstance that occurred. There is no change in circumstance. The physical facilities of these systems were separate before the consolidation, are separate today. The production facilities are located in each of the communities, and as Mr. Seidel indicated, they're not interconnected. There's no correlation between the cost being incurred in one utility versus the cost being incurred in the other utility. What happened in the consolidation was they took a holding company that had subsidiaries and they made it into one company that has divisions. Pure and simple, that's it. Now, what is important, I think, are the two cases that we're talking about. One is the city of Chicago. Again, what the city of Chicago said is when you have localized costs, those should be paid for by the residents in that local area. That is precisely what we're saying here. The localized costs for Lake Holiday and for all the utilities should be allocated and paid to those. Now, you still have overhead and general costs, as Mr. Seidel said, that are spread to everyone, but you can still have rate differences. Second of all, I would ask that you review the REACT case as well, because the REACT case, which they don't mention, also says that you can have separate rates based upon localized costs. In REACT, the court talks about the Chicago Transit Authority and the railroad class and said that they have special costs because they're all served at 12.5 kV and they're a similar service. Therefore, their rate should be entirely different than anyone else's. And that's because they're localized costs, and that's what we're saying here. Now, they're speculating that, well... Those localized costs are raising the rate above what others pay. You are arguing for localized costs to reduce what the Lake Holiday customers owe. That's correct, and in REACT, you will see that the CTA is paying lower costs because of that. If it works one way, it works the other way. What they're speculating here is, well, at some point in time, that's probably correct, that Lake Holiday will have some capital improvement, and under the fact that they're paying localized costs, they will pay for those facilities. Lake Holiday understands that. They're not saying, well, today we want to have rates based upon our system, but tomorrow, if we have a capital improvement, we want statewide rates. That's not what we're saying. We're saying what the commission needs to do is follow the practice that it had, which is setting the rates separately for each of these systems and continue to do that and to avoid what the commission was trying to avoid when it did the consolidation. In this particular situation, it told people, you're not going to have any adverse rate impact, but yet in this case, our clients saw 110 percent rate increase when the system rate increase was only 36 percent, and where the commission itself calculated that had they done it the way they did it before, the increase would only be 40 percent. Thank you. Can I ask you a quick question? Sure. A very general question. You mentioned several times in the briefing. Yes. Is that just something that we know because when our bill goes 110 percent higher, we're shocked, or is there a legal basis for that? I mean, is there statutory, regulatory, or case law supporting such a... There is no magic formula to say it's rate shock. I was almost going to quote what Justice Douglas said about pornography, but I want you to know when you see it. But if you look in the testimony, a staff witness, Bonds, was asked, when do you start considering rate shock? And he said, well, when rates go up 30 percent or so. He starts to look at it. Well, here they went up 110 percent. The only way I can analogize that is if you came in today and you filled up your car and gas was $2 a gallon, and then next week you go to the gas station and it's $4.25 a gallon, which is 110 percent increase, that's rate shock. To me, if suddenly it went up like that, I would say, why? And I think it's also rate shock because of the fact that the system-wide increase was only 36 percent, yet they're being asked to pay 110 percent on a commodity such as water, which is an essential commodity. So that's why we believe that there is rate shock here. Now, thank you. And thank you all for your audience today. We'll take this matter under advisement, get back to you with a written discussion within a short time. We'll now take a short recess. Thank you.